ALBRIGHT, STODDARD, WARNICK
 & ALBRIGHT
G. MARK ALBRIGHT
Nevada Bar No. 001394
Quail Park I, Suite D-4
801 South Rancho Drive
Las Vegas, Nevada 89106
Tel: 702-384-7111
Fax: 702-384-0605

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| IN RE: HARRAH'S SHAREHOLDER LITIGATION | CASE NO: 2:06-cv-1356 (JCM-LRL) |

**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs, by their attorneys, submit this Amended Consolidated Class Action Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.      This is a shareholder class action brought by plaintiffs on behalf of holders of Harrah's Entertainment Group, Inc. ("Harrah's" or the "Company") common stock to enjoin a proposed going-private transaction whereby a group of private equity firms has proposed to cash-out Harrah's shareholders at an unfair and grossly inadequate price, as detailed herein (the "Proposed Transaction").

2.      On December 19, 2006 Harrah's publicly announced that it had entered into a definitive agreement with defendants Apollo Management L.P. ("Apollo Management") and Texas Pacific Group ("Texas Pacific") (Apollo Management and Texas Pacific are referred to collectively as the "Private Equity Defendants") whereby the Private Equity Defendants would acquire all of the outstanding shares of the Company.  Pursuant to the offer, Harrah's shareholders were to receive $90.00 in cash for their stock at the closing of the deal, which is expected to take as long as eighteen months.

3.      The Individual Defendants have made materially false and misleading statements and have failed to disclose material facts in a proxy solicitation.

4.      The consideration offered in the Proposed Transaction is unfair and grossly inadequate, because among other things: the intrinsic value of Harrah's common stock is materially in excess of the amount offered, given the Company's growth and anticipated operating results, net asset value and future profitability; and the Plaintiffs will have to wait as long as eighteen months to receive any payment from the Private Equity Defendants.

5.      In breach of their fiduciary responsibilities when transferring corporate control, Defendants have withheld and obscured vital information needed by shareholders to properly assess and consider the Proposed Transaction and the true value of the Company, in breach of their fiduciary responsibilities when transferring corporate control.

**JURISDICTION AND VENUE**

6.      The claims asserted arise under and pursuant to Section 14(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") 15 U.S.C. ☐ 78(n) (a) and SEC Rule 14(a)-9 (17 CFR § 240.14a-9) promulgated thereunder.

7.      This Court has jurisdiction over the subject matter of this action pursuant to ☐ 27 of the Exchange Act (15 U.S.C. ☐ 78aa) and 28 U.S.C. ☐ 1331.

8.      Venue is proper in this District pursuant to ☐ 27 of the Exchange Act, and 28 U.S.C. ☐ 1391(c).  Many of the acts alleged herein, including the dissemination of false and misleading information, occurred in substantial part in this District.  In addition, the Company maintains its principal executive offices in this District.

9.      In connection with the acts alleged in this complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone conversations and the facilities of the national securities markets.

**THE PARTIES**

10.      Plaintiffs Natalie Gordon, Max Phillips, Lou Ann Murphy, Leonard Shapiro, and Deborah Barnum are and at all relevant times have been owners of Harrah's stock.

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

- 3 -

1         11.   Defendant Harrah's is a corporation organized and existing under the laws of the

2   state of Delaware, with its headquarters located at One Harrah's Court, Las Vegas, Nevada

3   89119.   With its $9.3 billion acquisition of Caesars Entertainment, Inc. in 2005, Harrah's

4   became the world's largest gaming-entertainment company.   Harrah's owns or manages

5   approximately 39 casinos, casino/hotels, and riverboat casino facilities through a wholly-owned

6   subsidiary, Harrah's Operating Company, Inc., which operates under the Harrah's, Caesars,

7   Showboat, Horseshoe and Rio brand names.   Harrah's employs over 85,000 employees and

8   maintains facilities which have an aggregate of approximately 3 million square feet of gaming

9   space and approximately 40,000 hotel rooms.   For fiscal year 2005, Harrah's revenues rose to

10   $7.1 billion, a 56.3% increase over the prior year, while adjusted income from continuing

11   operations grew 50.6%, to $516.6 million, from $341.1 million for the prior year.   Harrah's

12   common stock is traded on the New York Stock Exchange under the symbol "HET."

13         12.   Defendant Gary W. Loveman ("Loveman") has served as a director of the

14   Company since February 2000, Chief Executive Officer since January 2003, and Chairman of

15   the Board (the "Board") since January 2005.   He has been the Company's President since April

16   2001 and was its Chief Operating Officer from May 1998 through December 2002.   He was

17   also a member of the three-executive Office of the President from May 1999 to April 2001 and

18   was Executive Vice President from May 1998 to May 1999.   Loveman is also a director of

19   Coach, Inc., a designer and marketer of high quality handbags and women's and men's

20   accessories.

21         13.   Defendant Charles L. Atwood ("Atwood") has served as a director of the

22   Company since July 2005 and Chief Financial Officer since 2001.   He was also a Senior Vice

23   President from April 2001 to February 2006 and Treasurer from October 1996 to November

24   2003.   Additionally, he was a Vice President of the Company from October 1996 to April 2001.

25   Atwood also serves as a director of Equity Residential, an owner and operator of multi-family

26   properties.

27         14.   Defendant R. Brad Martin ("Martin") has served as a director of the Company

28   since July 1996.   Martin has also served as Chairman of the Board of Saks Incorporated

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1    (formerly Proffitt's, Inc.), a retail department store company, since 1989, and served as its Chief

2    Executive Officer until January 2006.    He is also a director of First Horizon National

3    Corporation, a banking corporation.

4          15.    Defendant Gary G. Michael ("Michael") has served as a director of the Company

5    since November 2001.  Michael was Chairman of the Board and Chief Executive Officer of

6    Albertsons, Inc., a grocery supermarket company, from February 1991 to April 2001. He is also

7    a director of Questar, Inc., an energy development company; OfficeMax Inc., a business-to-

8    business and retail distributor of office products; IDACORP, Inc., an energy company; and The

9    Clorox Company, a household products manufacturing company.  He is a member of the Audit

10   and Finance Committees of the Board.

11         16.    Defendant Stephen F. Bollenbach ("Bollenbach") has served as a director of the

12   Company since 2005.  Bollenbach also serves as Co-Chairman of the Board and Chief

13   Executive Officer of Hilton Hotels Corporation, a hotel and hospitality company, since May

14   2004, and was its Chief Executive Officer and President from February 1996 to May 2004.  He

15   was also a Director and Chairman of the Board of Caesars Entertainment, Inc. from December

16   1998 until the effective date of its merger with the Company.  He is a member of the Audit

17   Committee of the Board.

18         17.    Defendant Ralph Horn ("Horn") has served as a director of the Company since

19   July 1995.   Horn has also served as Chairman of the Board of First Tennessee National

20   Corporation, a banking corporation, from January 1996 until December 2003; a director of

21   Gaylord Entertainment Company, a hospitality and entertainment company; and Mid-America

22   Apartment Communities, Inc., an umbrella partnership real estate investment trust. He is a

23   member of the Human Resources and Nominating/Corporate Governance Committees of the

24   Board.

25         18.    Defendant Boake A. Sells ("Sells") has served as a director of the Company

26   since February 1990.  Sells was Chairman of the Board and Chief Executive Officer of Revco

27   D.S., Inc., a retail pharmacy chain, from September 1987 to October 1992 and was President of

28

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1   that company from April 1988 to June 1992.  He is a member of the Human Resources and

2   Nominating/Corporate Governance Committees of the Board.

3        19.    Defendant Barbara T. Alexander ("Alexander") has served as a director of the

4   Company since February 2002.  Alexander was also a Senior Advisor for UBS Warburg, an

5   investment banking firm, from October 1999 to January 2004 and a Managing Director of

6   Dillon Read & Co, Inc., an investment banking firm, and successor companies from January

7   1992 until October 1999.  UBS is serving as the financial advisers for Harrah's in the Proposed

8   Transaction.    Alexander is also a director of Centex Corporation, a building and related

9   services company; Burlington Resources, an independent oil and gas company; and Federal

10  Home Loan Mortgage Corporation, or "Freddie Mac", a stockholder-owned company that

11  supports home ownership and rental housing.    Alexander is Chairperson of the Audit

12  Committee and is a member of the Finance Committee.

13       20.    Defendant Frank J. Biondi ("Biondi") has served as a director of the Company

14  since May 2002.  Biondi is also a Senior Managing Director of WaterView Advisors LLC, a

15  private equity fund specializing in media.  He was Chairman and Chief Executive Officer of

16  Universal Studios from April 1996 through November 1998 and President and Chief Executive

17  Officer of Viacom, Inc. from July 1987 through January 1996.  He is also a director of The

18  Bank of New York Company, Inc., a financial holding company and provider of banking and

19  financial services; Amgen, Inc., a biotechnology company; Hasbro, Inc., a developer of

20  children's and family leisure time entertainment products; Seagate Technology, a manufacturer

21  of memory devices for computing and consumer electronic devices; and Cablevision Systems

22  Corporation, an entertainment and telecommunications company.   He is Chairman of the

23  Human Resources and Nominating/Corporate Governance Committees.

24       21.    Defendant Robert G. Miller ("Miller") has served as a director of the Company

25  since May 1999.  Miller is also the Chairman of the Board of Rite-Aid, Inc., a retail pharmacy

26  chain, a position he has held since December 1999.  He was Chief Executive Officer of that

27  company from December 1999 to July 2003. He was also Vice Chairman and Chief Operating

28  Officer of The Kroger Co., a grocery supermarket company, from May 1999 until December

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1999; Vice Chairman of the Board and Chief Executive Officer of Fred Meyer, Inc. a grocery supermarket company, from July 1998 to May 1999, and Chairman of the Board and Chief Executive Officer of Fred Meyer, Inc. from 1991 to July 1998.  He is also a director of Nordstrom, Inc., a fashion specialty retailer, and a director and Chairman of Wild Oats Markets, Inc., a natural and organic foods retailer.  He is a member of the Human Resources and Nominating/Corporate Governance Committees of the Board.

22.    Defendant Christopher J. Williams ("Williams") has served as a director of the Company since November 2003.  Williams has also served as Chairman of the Board and Chief Executive Officer of Williams Capital Group, L.P., an investment bank, since 1994, and Chairman of the Board and Chief Executive Officer of Williams Capital Management, LLC, an investment management firm, since 2002.  He is a member of the Audit Committee of the Board.

23.    Defendants Loveman, Atwood, Martin, Michael, Bollenbach, Horn, Sells, Alexander, Biondi, Miller, and Williams are referred to herein as the "Individual Defendants."

24.    Defendant Apollo Management is an investment firm with headquarters located at 1301 Avenue of the Americas, New York New York 10019-6033.  Apollo, founded in 1990, is among the most active private investment firms in terms of both number of investment transactions completed and aggregate dollars invested.  Since its inception, Apollo has invested over $16 billion in a wide variety of industries both domestically and internationally.  The firm's most recent private equity fund, Apollo Investment Fund VI, L.P. has capital commitments of $10.1 billion.

25.    Texas Pacific is a private investment partnership that was founded in 1992 and currently has more than $30 billion of assets under management.  Texas Pacific Group, with its headquarters located at 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102, invests in franchises across a range of industries, including technology, industrials, retail/consumer, airlines, media and communications, financial services and healthcare.

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

**BACKGROUND OF THE COMPANY**

26.    Although the present Company was incorporated on November 2, 1989, the Company's roots date back to 1937, when founder Bill Harrah opened a bingo parlor in Reno, Nevada. Prior to 1989, Harrah's operated under predecessor companies. The Company did not enter Las Vegas, one of the world's largest gaming markets, until the 1980's.

27.    In the early 1990's, Harrah's languished, deriving much of its profits from casinos and riverboats outside of Las Vegas, including casinos in Illinois, Indiana, Mississippi and Louisiana. Towards the end of the 1990's, the Company embarked on an acquisition spree culminating in the purchase of Showboat, Inc., (completed in June 1998) for $519 million, or $30.75 a share, and the assumption of $635 million in debt. The all-cash acquisition created a company with annual projected casino revenue of $2 billion and total revenue (including non-casino operations) of $2.5 billion, according to Harrah's. The purchase gave Harrah's four additional properties, located in Atlantic City, East Chicago, Indiana, Las Vegas and Sydney, Australia. The Las Vegas and Australia properties acquired from the Showboat were subsequently divested. Thereafter, in 1999 the Company acquired the Rio Hotel & Casino, Inc. ("Rio") on the Vegas Strip, which at the time had more than 2,500 suites and approximately 120,000 square feet of gaming space. Harrah's acquired all of Rio outstanding shares in a one-for-one stock transaction valued at $525 million and the assumption of Rio's debt. Despite these acquisitions, Harrah's limited Las Vegas presence made Harrah's a smaller player compared with rivals opening lavish new properties like the Venetian and Bellagio casinos.

28.    Facing increased competition as a result of a wave of consolidation, which started with the deal between Boyd Gaming Corp. and Coast Casinos Inc., Harrah's embarked on one of its largest and most ambitious acquisitions, that of Caesar's Entertainment, Inc. ("Caesar's"). On June 13, 2005, Harrah's acquired Caesar's, forming the world's largest provider of branded casino entertainment. The deal was lauded by analysts as it provided Harrah's with brand name recognition as well as the higher-end Vegas casinos it needed.

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

29.     On December 23, 2005, Harrah's acquired the Imperial Palace Hotel & Casino in Las Vegas for approximately $370 million, a 52,000 square-foot casino and 2,640 hotel rooms, occupying an 18.5 acre site on the Las Vegas strip.

30.     This aggressive growth strategy is only now starting to yield results.   For example, on April 27, 2006, the Company said first-quarter revenues rose 93.3 percent to a record $2.4 billion from the $1.2 billion reported in the 2005 first quarter.  Property Earnings Before Interest, Taxes, Depreciation and Amortization (Property EBITDA) doubled to a record $690.1 million from Property EBITDA of $343.2 million in the year-earlier period.   First-quarter Adjusted Earnings Per Share (EPS) from continuing operations rose to a record $1.02, up 22.9 percent from $0.83 in the 2005 first quarter.   Commenting on these record results, Defendant Loveman stated:

> The 2006 first-quarter produced the best operating results in Harrah's history due to continued successful execution of an organic-growth strategy that has enabled us to record same-store sales growth in all but one of the past 34 quarters[.]
>
> In addition, we achieved our projected $80 million first-year synergy target for the Caesars properties by the end of the first quarter -- three months ahead of schedule -- and expect the first full-year number to exceed $110 million. We project our second year of Caesars ownership will yield $180 million of synergies.

31.     Moreover, Loveman prominently noted that this "extraordinary first-quarter performance was accomplished despite the loss of properties in Hurricanes Katrina and Rita and during a period in which our Total Rewards customer-loyalty program was not yet fully integrated into all Caesars properties[.]"  Loveman continued:

> But the tremendous operating momentum we have achieved is not the sole reason we are confident about our future …. we're even more excited about the extraordinary range of growth opportunities that lie before us, both domestically and abroad. In Atlantic City, we anticipate the new luxury retail shopping complex at Caesars will open in phases beginning this June, and we are forging ahead with a $550 million expansion at Harrah's. We plan to announce details about the master plan for our center Boardwalk properties in Atlantic City -- where we have more than 20 acres available for additional development -- this summer.
>
> Pending regulatory approval, we expect a smaller version of the Grand Casino in Biloxi, Mississippi, will also begin serving customers this summer while we plan development of a new and larger facility, which will be the Gulf Coast's best casino-entertainment offering . . . Racing begins at Harrah's Chester near Philadelphia in September; pending regulatory approvals, we expect to open the

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

casino there in early 2007. We also plan an expansion of the Horseshoe Hammond property in the Chicago area, and have submitted a proposal for a large gaming-entertainment complex in Pittsburgh.

On the international front, we are moving ahead with plans for our previously announced ventures in Spain, Slovenia and the Bahamas and have submitted our final bid for the multi-billion dollar integrated resort in Singapore, We are also pursuing additional opportunities in other areas throughout the world.

Las Vegas offers perhaps the most exciting domestic development opportunity for Harrah's, . . .  Not only do we have seven existing facilities here, but we also have more than 100 undeveloped acres around those properties, giving us a much broader footprint in the world's biggest gaming market.

Over the past eight years, we have demonstrated our ability to drive customer visitation to multiple Harrah's properties across the wide range of markets we serve, . . .  That ability will serve us well in the future as we execute the stages of our master development plan for Las Vegas, which we will unveil this summer, and bodes well for other high-return projects that will introduce the Harrah's brands to a global audience.

32.     On July 27, 2006, Harrah's reported record second-quarter results, stating that:

- •     Revenue reached a record $2.4 billion, up 67%;

- •     Property EBITDA was up 70% to a record $673 million and operating margins improve in most regions;

- •     Adjusted EPS from Continuing Operations of 95 cents was up 10% to a quarterly record;

- •     The Company realized $118 million in first-year synergies from Caesars Entertainment acquisition; and

- •     Overall operations remain strong.

Commenting on these record second-quarter results, Defendant Loveman stressed the strengths of the Company's operations and its positive outlook for the future:  "Our healthy, broad-based growth in the second quarter demonstrates that our overall operations remain strong".  Furthermore, Loveman stated: "Our core business – particularly in Las Vegas and Atlantic City – remains robust, and customer visitation and spending remains healthy across the country."  With respect to future expansion plans, Loveman stated:  "[o]ne of our most significant projects is our master planning for the Las Vegas Strip . . .  While our plans for Las Vegas have yet to be finalized, one thing is

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

certain – we will invest prudently and cost effectively, as we have consistently done in the past."

33.     According to reports on *Bloomberg* news service on October 2, 2006, Harrah's has increased its profits in each of the previous 10 quarters, except for the third-quarter last year, when it closed four casinos following Hurricanes Katrina and Rita.

34.     The Company's third-quarter results, released after the announcement of the private Equity Defendants' initial offer, were no exception to this trend.  Despite the temporary shutdown of Atlantic City Casinos due to a state budget impasse, the third-quarter report issued on October 25, 2006 showed a continuing pattern of strong performance: revenues rose 11% to a third-quarter record of $2.5 billion; property EBITDA climbed to a record of $685 million; adjusted EPS from Continuing Operations reached 94 cents; and same-store sales rose 8%.

35.     Discussing these strong returns, Loveman noted the Company's expansion, "During the third quarter, we opened our new 450 room luxury hotel in New Orleans, a new smaller Grand Casino Biloxi hotel & Spa in Mississippi and a 258 room hotel in Metropolis Illinois."

36.     Most critical to Harrah's expansion in the third quarter was its announcement that it had completed assembling land for its Las Vegas master plan (the "Development Plan"). Loveman noted that with the final acquisition of the Barbary Coast property, the Company "will have a total of nearly 350 acres of land encompassing an area between Paris Las Vegas to the South, Harrah's Las Vegas to the north, Koval Avenue to the east, and Rio to the west.  Though the investing community was eagerly awaiting the Company's announcement of its intentions for the Development Plan, Loveman said only that such an announcement would be forthcoming.   In the meantime, the third-quarter report indicated that the Private Equity Defendants had made an initial offer to takeover the company.

37.     Prior to the announcement of any potential sale of the Company, the trading price of Harrah's common stock, reached a 52-week high of $82.33 on May 10, 2006.  This peak came after the announcement of the Company's first-quarter earnings on April 27, 2006,

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

- 11 -

1    which was followed by another record quarter.  Yet, on September 29, 2006 the last trading day

2    before the first offer to buy the Company was announced, Harrah's was trading at only $66.23.

3    The depressed share price was due in part to several one-time events, including the closing of

4    all New Jersey casinos due to a budget impasse and expenses incurred in a lobbying effort in

5    connection with a new casino in Rhode Island.  Also, due to Harrah's failure to announce its

6    intentions with respect to the Development Plan, the market had not taken yet factored in the

7    Company's massive real estate holdings and potential for growth.  At the time, several analysts

8    noted that the stock was significantly undervalued.

9        38.    On October 2, 2006, *Bloomberg* news service reported that "Harrah's shares are

10   cheap compared with the cash its properties including Caesar's Palace and Harrah's Las Vegas

11   produce," citing analysts such as Steve Ruggiero of CRT Capital Group, LLC.

12       39.    As one analyst put it, "Harrah's is a company that had tremendous long-term

13   potential, and it has only begun realizing the value of the assets acquired in last year's merger

14   with Caesars Entertainment.  Investors are still anxiously awaiting announcements regarding

15   master plans for the Las Vegas Strip and Atlantic City – two markets which now account for

16   60% of the Company's cash flow.  In fact, this morning Harrah's separately announced an

17   agreement to snag 24 acres of land adjacent to Boyd Gaming's Stardust Property on the Strip in

18   exchange for Boyd's Barbary Coast – the key piece of land on the strip that should allow

19   Harrah's to move forward with its plans."

20       40.    Likewise, *USA TODAY* reported on October 3, 2006 the comments of Rod

21   Petrick, an analyst at broker Stifel Nicolaus, that "[Harrah's] traded at a relative discount

22   compared to its peer group."

23       41.    The Company was poised for growth, but it was also ripe for exploitation by the

24   defendants.

## SUBSTANTIVE ALLEGATIONS

25

26   **A.     The Proposed Transaction and Other Offers**

27

28

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

42.     In the fall of 2006, the Private Equity Defendants announced their intentions to make a tender offer for all of the outstanding shares of Harrah's.  This offer was timed to cap Harrah's market price at an artificially low level.

43.     On October 2, 2006, Harrah's issued a press release stating that it had received an offer from the Private Equity Defendants to be taken private.  Under the terms of the offer, shareholders of Harrah's would have received $81 in cash for each share of Harrah's stock owned.

44.     By carefully timing the issuance of the Proposed Transaction during a downturn in the price of Harrah's stock, Defendants were able to claim that the price represented a premium of approximately 22% over the trading price immediately prior to the announcement.

45.     In early December 2006, the Company received bids from the Private Equity Defendants and Penn National Gaming, Inc ("Penn National"), a casino operating company. Though the Company issued a press release after receiving the initial bid from the Private Equity Defendants, it refused to confirm that it had received other offers.  Despite the Company's attempt to keep the bidding process secret, *The Wall Street Journal* reported on December 18, 2006, that Penn National submitted a bid of $87.00 per share and raised their bid at least once.

46.     On December 19, 2006, the Company announced that it had entered into a definitive agreement with the Private Equity Defendants to acquire Harrah's in a deal valued at $27.8 billion.  Pursuant to the agreement shareholders would receive $90.00 per share in cash. (The agreement is hereafter referred to as the "Proposed Transaction".)  Once again, using the artificially low share price as a basis for comparison, the Defendants alleged that the Proposed Transaction represents a 36% premium over the trading price immediately following the announcement of the initial offer.  The Company did not comment on the Penn National offers or any other bids.  On the date of the announcement, the stock closed at $82.32 per share.

47.     The Proposed Transaction differed from the Penn National offer in two key respects.

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

- 13 -

48.     First, because the Private Equity Defendants have no experience in the gaming industry and no management ready to assume control of the operations of the Company, it was reported that they will likely retain the Company's current managers.  As The Wall Street Journal noted on November 29, 2006, "current management, led by Gary Loveman, chairman and chief executive officer, would likely be retained under the Apollo/Texas pacific proposal."

49.     The article went on to note that management would likely be replaced if the Company were bought by Penn National.  As an established casino operating company, Penn National already has an experienced casino operating management team in place.

50.     Second, on December 20, 2006, *Bloomberg News* reported that the Private Equity Defendants "will have to undergo the extensive casino-licensure process in every jurisdiction where Harrah's operates casinos."  As a result of these onerous and time consuming requirements, the Proposed Transaction would not close in the near future.  *Bloomberg News* quoted one source as saying that "regulators in states from Nevada to New Jersey will examine the new owners' personal finances to make sure they're not in debt.  Officials will scrutinize friends, family and associates to ensure they're free of criminal influence."  The article noted that the process could take as long as eighteen months.

51.     Penn National, however, already operates casinos in a number of these jurisdictions and their owners have already been vetted.  As The Wall Street Journal reported on December 15, 2006, Penn National "would likely face an easier time" in the licensure process.

52.     What this means to shareholders is that in order to receive the $90.00 per share buyout from the Private Equity Defendants, they will have to retain their shares for an inordinate amount of time, whereas a deal with Penn National would be payable much sooner.

53.     The Individual Defendants are obligated to explore all alternatives to maximize shareholder value, including the value to shareholders of closing a sale of the company quickly.

**B.      The Terms of the Proposed Transaction are Unfair and the Price is Grossly Inadequate**

- 14 -

54.     The intrinsic value of Harrah's common stock is materially in excess of the amount offered for those securities in the Proposed Transaction given the Company's prospects for future growth and earnings.

55.     Defendants have timed the offer to take advantage of an artificially depressed stock price and a fundamental misunderstanding of true value of Harrah's.

56.     Moreover, the defendants' timing of the announcement of the Proposed Transaction has placed an artificial lid on the market price of Harrah's stock.  For the next twelve to eighteen months the market will not reflect the Company's improving potential.

57.     The $90.00 offer represents a paltry 8% premium over the 52-week high.  Worse yet, in order to receive the $90.00 price, shareholders will have to retain their shares until the Proposed Transaction closes in twelve to eighteen months.  Due to the extended delay in closing the proposed transaction, the time value of money will eat away at any so-called "premium" payable in the future.

58.     The stock closed at $82.32 on the day the Proposed Transaction was announced. That price, determined by a market informed by the Proposed Transaction, is more reflective of the value of the Private Equity Defendants offer and actually represents a $1.01 discount from the 52-week high of $83.33.

C.     **Shareholders Have Been Deprived of the Benefits of the Development Plan**

59.     The Proposed Transaction stifles the public shareholders' opportunity to participate in Harrah's anticipated master plan for the Las Vegas Strip (the "Development Plan"), the plan for expansion in Atlantic City plan and the benefits of the recently completed Caesar's merger.  Harrah's has made its expansion plans clear in recent months, and, indeed, stated on October 2, 2006 that it had acquired the Barbary Coast Hotel and Casino on the Las Vegas Strip from Boyd Gaming Corp.  The 24-acre plot is the latest piece of land Harrah's has accumulated in a continuous block of real estate on the Strip's east side, where it already owns 350 acres, along with casinos such as Paris, Bally's and the Imperial Palace.

60.     This land swap is part of the Company's expected redevelopment of the area into a major so-called "meta-resort".  Recent trends in the gaming industry have centered on the

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

creation of luxury resort complexes to continue and sustain record setting growth.  For example, Harrah's rival MGM Mirage Inc. is in the midst of constructing the $7-billion City Center resort and casino.  Boyd Gaming, another competitor, is set to begin construction on its own complex next year at an estimated cost of $4 billion.  According to the *Los Angeles Times,* on October 3, 2006, citing Anthony Curtis, president of LasVegasAdvisor.com, Harrah's has "been strategically purchasing land in this area for years and years … The Barbary Coast was the final piece of the puzzle for Harrah's.  I would be stunned if a change of ownership changes those plans".

61.     The day before the Board announced its acceptance of the Proposed Transaction, the Wall Street Journal noted that the specifics of "Harrah's plan for Las Vegas [had been] delayed for months," but was due to be announced in the near future.  The Development Plan has yet to be reflected on the Company's financial results or in its stock price.

62.     Moreover, the Company's failure to clarify its intentions with respect to the Development Plan contributed to its artificially low stock price.  According to the *Las Vegas Review Journal*, on October 3, 2006, Jeffrey Logsdon, managing director of BMO Capital Markets,  "Harrah's is trading at the lowest multiples of any of the Big Six operators, which also include Station Casinos, Boyd Gaming Corp., Las Vegas Sands Corp., Wynn Resorts Ltd. and MGM Mirage."  Logsdon further added that: "Harrah's probably has one of the higher misunderstanding quotients attached to its stock".  Moreover, he indicated that "there's uncertainty about how they'll structure their Las Vegas opportunities and uncertainty over whether they'll be able to break into the Asian marketplace.  That depresses the equity value.  It doesn't change the value of the company.  It's only investor perception."

63.     Though it was earned at their expense, the public shareholders will be deprived of this opportunity, due to management's decision to withhold its announcement and keep the terms of the Development Plan a secret.  Only the Private Equity Defendants will reap the benefits of the Development Plan, which is expected to reshape the landscape of Las Vegas.

64.     The Proposed Transaction will, for inadequate consideration, deny Plaintiffs and the other members of the Class the opportunity to share proportionately in the future success of

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

the Company and its valuable assets, including the benefits of the full integration of the Caesar's properties, the Las Vegas Development Plan and the Atlantic City expansion.

**D.      The Proposed Transaction Suffers from Serious Conflicts of Interest.**

65.      The Company's management has serious conflicts of interest.  As noted earlier, Penn National, a casino operator with their own extensive management team, would have no further need for the Company's current management.  On December 15, 2006, *The Wall Street Journal* reported that in contrast to the Proposed Transaction, "Penn National would likely replace Harrah's current management team including Chairman and Chief Executive Officer Gary Loveman with its own executives."

66.      Under the proposed transaction, however, it is expected that Loveman will continue as Chairman, CEO and President of the Company.  Neither of the Private Equity Defendants have any experience in the gambling industry.  Experts have noted that upon consummation of the proposed transaction, it is likely that Harrah's top management would stay with the Company, which is considered efficiently run by Wall Street standards.  In fact, Dennis Farrell of Wachovia High Yield Research states: "I think [Harrah's Chairman Gary Loveman] is the linchpin of this whole deal."

67.      On October 4, 2006, *The New York Post*, citing sources involved in the negotiations, noted that "Loveman expects to be part of an eventual deal, but took careful steps not to make the negotiations appear like a typical management buyout."  Loveman's expectation to be part of any deal in what may be a disguised management buyout means he has an irreconcilable conflict of interest.

68.      In addition to keeping their jobs, management would likely share in the benefits of taking the company private.  Management's financial interest in taking the Company private has not been disclosed.

69.      Nonetheless, management clearly has a motive to ensure that the Private Equity Defendants were able to purchase the Company.  In an article entitled *"Fine Line of Selling, Selling Out, the Firm"*, *The Wall Street Journal* reported on January 30, 2006 that "board members were upset when they realized that Loveman had some discussions and signed a

- 17 -

1   confidentiality agreement with a buyer before the full board knew of their interest . . . In effect,

2   Harrah's board didn't even know it was for sale.  Mr. Loveman declined to comment "

3       70.    Moreover, Harrah's engaged financial advisers with ties to the Private Equity

4   Defendants, rather than engaging financial advisors who were truly independent.  According to

5   press reports, Harrah's has chosen UBS Investment Bank ("UBS") as its adviser for the

6   Proposed Transaction.  UBS Investment Bank has acted as merger advisor to Texas Pacific

7   Group in the past.  Specifically, UBS acted as the merger adviser for Texas Pacific Group's,

8   November 10, 2003, acquisition of the Kraton Polymers Group of Companies ("Kraton

9   Polymers" or the "Company") for a total enterprise value of $770 million.  UBS cannot be

10  objective as it is unavoidable that it will consider the expectation of future business from the

11  Private Equity Defendants, including Texas Pacific that is far more lucrative than the fee

12  Harrah's is paying for this engagement.  The purpose of hiring such bankers with prior

13  relationship with Texas Pacific Group was to safeguard against receiving an unfavorable

14  fairness opinion.

15      71.    Additionally, UBS and Leon Black, Apollo Group's co-founder, are investors in

16  The New York City Investment Fund, a private fund established in late 1996, under the auspices

17  of the nonprofit organization, The Partnership for New York City.

18      72.    Finally, defendant Alexander, one of Harrah's directors, is a former Senior

19  Advisor to UBS.

20      73.    Considering the myriad conflicts of interest and Loveman's obvious breach of

21  his fiduciary duties in signing a confidentiality agreement with the Private Equity Defendants

22  behind the Company's back, it is clear that Plaintiffs will suffer irreparable damage unless the

23  Individual Defendants are enjoined from continuing to breach their fiduciary duties and carrying

24  out the Proposed Transaction.

25  **E.    The Proxy Solicitation**

26      74.    On December 19, 2006 the Company filed with the SEC a Schedule 14A proxy

27  statement pursuant to Section 14(a) of the Securities and Exchange Act of 1934 in connection

1   with the Proposed Transaction marked on page 1 as "Soliciting Material pursuant to 240.14(a)-

2   12." (the "Proxy Solicitation").

3        75.   The Proxy Solicitation indicated that it was filed in anticipation of the issuance

4   of a forthcoming Proxy Statement.

5        76.   The Proxy Solicitation asserted that if the Proposed Transaction is approved, the

6   composition of the Board of Directors will change.   This statement is false and misleading

7   because it gives the impression that by approving the Proposed Transaction, the Individual

8   Defendants are not acting in their own self-interest and are voting themselves out of their

9   positions.

10       77.   The Proxy Solicitation described the benefits of the Proposed Transaction and

11  further asserted that the Proposed Transaction "represents a significant premium to

12  shareholders," with a chart indicating that the offer is 36% premium over the value of those

13  shares on the day prior to the announcement of the original offer.   This statement is false and

14  misleading because the $90 price is only a small premium over the stock's 52-week high.

15       78.   In addition, the Proxy Solicitation fails to disclose that:

16       (a) the interest of the Individual Defendants in ensuring that the Proposed Transaction is

17  approved and that the Proposed Transaction is in effect a typical management buyout;

18       (b) the Individual Defendants were engaged in self-dealing and not acting in good faith

19  towards the shareholders in approving the Proposed Transaction;

20       (c) unbeknownst to the Company, Loveman had entered into a confidentiality agreement

21  with the Private Equity Defendants concerning the buyout;

22       (d) the Individual Defendants artificially depressed the stock price by withholding the

23  announcement of the Development Plan until the announcement of the Proposed Transaction;

24       (e) the Proposed Transaction was timed to capture the Company's future potential

25  without paying an adequate or fair price for the Company.

26       (f) the Individual Defendants made no effort to seek higher bids for the Company than

27  those offered by the Private Equity Defendants or other efforts to obtain the highest selling price

28  for the shareholders;

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

- 19 -

1  (g) the Individual Defendants made no effort to consider alternative offers that would

2  not require as many as eighteen months to close.

3  **CLASS ACTION ALLEGATIONS**

4  79.    Plaintiffs bring this action on their own behalf and as a class action on behalf of

5  all holders of Harrah's common stock who are being and will be harmed by defendants' actions

6  described below (the "Class").  Excluded from the Class are defendants herein and any person,

7  firm, trust, corporation, or other entity related to or affiliated with any defendants.

8  80.    This action is properly maintainable as a class action.   The Class is so numerous

9  that joinder of all members is impracticable.  As of January 31, 2006, Harrah's had 184,092,919

10  shares of common stock and outstanding.  The actual number of public shareholders of Harrah's

11  will be ascertained through discovery.

12  81.    There are questions of law and fact which are common to the Class and which

13  predominate over questions affecting any individual Class member.   The common questions

14  include the following:

15  (a)    whether defendants have breached their fiduciary duties of undivided

16  loyalty, independence or due care with respect to Plaintiffs and the other members of the Class

17  in connection with the Proposed Transaction;

18  (b)    whether the Individual Defendants are engaging in self-dealing in

19  connection with the Proposed Transaction;

20  (c)    whether the Individual Defendants have breached their fiduciary duty to

21  secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiffs

22  and the other members of the Class in connection with the Proposed Transaction;

23  (d)    whether the Individual Defendants are unjustly enriching themselves and

24  other insiders or affiliates of Harrah's;

25  (e)    whether defendants have breached any of their other fiduciary duties to

26  Plaintiffs and the other members of the Class in connection with the Proposed Transaction,

27  including the duties of good faith, diligence, honesty and fair dealing;

28

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1          (f)    whether the defendants, in bad faith and for improper motives, have

2      impeded or erected barriers to discourage other offers for the Company or its assets;

3          (g)    whether the Proxy Solicitation contained materially omissions or false

4      and/or misleading statements; and

5          (h)    whether Plaintiffs and the other members of the Class would suffer

6      irreparable injury were the Proposed Transaction consummated.

7      82.    Plaintiffs' claims are typical of the claims of the other members of the Class and

8      Plaintiffs do not have any interests adverse to the Class.

9      83.    Plaintiffs are adequate representatives of the Class, have retained competent

10     counsel experienced in litigation of this nature, and will fairly and adequately protect the

11     interests of the Class.

12     84.    The prosecution of separate actions by individual members of the Class would

13     create a risk of inconsistent or varying adjudications with respect to individual members of the

14     Class which would establish incompatible standards of conduct for the party opposing the Class.

15     85.    Plaintiffs anticipate that there will be no difficulty in the management of this

16     litigation.   A class action is superior to other available methods for the fair and efficient

17     adjudication of this controversy.

18     86.    Defendants have acted on grounds generally applicable to the Class with respect

19     to the matters complained of herein, thereby making appropriate the relief sought herein with

20     respect to the Class as a whole.

21     **FIRST CAUSE OF ACTION**

22     **On Behalf of Plaintiffs and the Class Against**
       **the Individual Defendants for Violation of SEC Rule 14a-9**

23

24     87.    Plaintiffs incorporate by reference and reallege each and every allegation

       contained above, as though fully set forth herein.

25

26     88.    The Proxy Solicitation was a proxy solicitation as defined in 17 C.F.R. §

       240.14a-(1) (1).

27

28

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

89.     The Proxy Solicitation contains false and misleading information where it asserts that the proposed Transaction "represents a significant premium" to shareholders.

90.     The Proxy Solicitation falsely and misleadingly states that the Board composition will change following the acquisition, giving the impression that by approving the Proposed Transaction, the Individual Defendants are not acting in their own self-interest and are voting themselves out of their positions.

91.     In the Proxy Solicitation the Individual Defendants failed to disclose their self-interest in ensuring that the Proposed Transaction is approved and that the Proposed Transaction is in effect "a typical management buyout."

92.     In the Proxy Solicitation the Individual Defendants failed to disclose that the Individual Defendants were engaged in self-dealing and not acting in good faith towards the shareholders in approving the Proposed Transaction.

93.     The Individual Defendants failed to disclose in the Proxy Solicitation that unbeknownst to the Company, Loveman had entered into a confidentiality agreement with the Private Equity Defendants concerning the buyout.

94.     The Individual Defendants failed to disclose in the Proxy Solicitation their efforts to artificially depress the stock price by withholding the announcement of the Development Plan until the announcement of the Proposed Transaction.

95.     In the Proxy Solicitation the Individual Defendants failed to disclose that the Proposed Transaction was timed to capture the Company's future potential without paying an adequate or fair price for the Company.

96.     In the Proxy Solicitation the Individual Defendants failed to disclose facts concerning their lack of efforts to seek higher bids for the Company than those offered by the Private Equity Defendants or other efforts to obtain the highest selling price for the shareholders.

97.     The Individual Defendants failed to disclose in the Proxy Solicitation facts concerning their lack of efforts to consider alternative offers that would not require as many as eighteen months to close.

- 22 -

98.     By making the statements set forth in paragraphs 90 and 91 and by failing to disclose the material facts set forth in paragraphs 92 through 96, the Individual Defendants are in violation of SEC Rule 14(a)-9 and 17 C.F.R. § 240.14a-9.

## SECOND CAUSE OF ACTION

### On Behalf of Plaintiffs and the Class Against
### the Individual Defendants for Breach of Fiduciary Duty

99.     Plaintiffs repeat and reallege each allegation set forth herein.

100.    The purpose of the Proposed Transaction is to enable the Private Equity Defendants to acquire the Company and its valuable assets for themselves at the expense of Harrah's public shareholders.

101.    Defendants have timed the announcement of the Proposed Transaction to capture the Company's future potential without paying an adequate or fair price for the Company.

102.    The Individual Defendants' kept the Company's stock trading at an artificial low, by failing to announce the Company Development Plan until after it had struck a deal with the Private Equity Defendants.

103.    The Individual Defendants failed to expose Loveman's self-interested efforts to effectuate the Proposed Transaction.

104.    The Individual Defendants are in a position of control and power over Harrah's public shareholders, and have access to internal financial information about Harrah's, its true value, expected increase in true value and the benefits of 100 percent ownership of Harrah's to which Plaintiffs and the class members are not privy.  The Individual Defendants are using their positions of power and control to benefit the Private Equity Defendants in this Proposed Transaction to the detriment of Harrah's public stockholders.

105.    In light of the foregoing, the Individual Defendants must, as their fiduciary obligations require:

(a)     undertake an appropriate evaluation of Harrah's worth as a merger/acquisition candidate;

1        (b)    take all appropriate steps to enhance Harrah's value and attractiveness as

2   a merger/acquisition candidate;

3        (c)    take all appropriate steps to effectively expose Harrah's to the

4   marketplace in an effort to create an active auction for Harrah's, including but not limited to

5   engaging in serious negotiations with the Private Equity defendants;

6        (d)    act independently so that the interests of Harrah's public stockholders will

7   be protected; and

8        (e)    adequately ensure that no conflicts of interest exist between the

9   Individual Defendants' own interests and their fiduciary obligation to maximize stockholder

10   value or, if such conflicts exist, to ensure that all conflicts be resolved in the best interests of

11   Harrah's public stockholders.

12        106.    Unless enjoined by this Court, the Individual Defendants will continue to breach

13   their fiduciary duties owed to Plaintiffs and the Class, and may consummate the Proposed

14   Transaction which will exclude the Class from its fair share of Harrah's valuable assets and

15   businesses, and/or benefit them in the unfair manner complained of herein, all to the irreparable

16   harm of the Class, as aforesaid.

17        107.    The Individual Defendants are engaging in self-dealing, are not acting in good

18   faith toward Plaintiffs and the other members of the Class, and have breached and are breaching

19   their fiduciary duties to the members of the Class.

20        108.    As a result of the Defendants' unlawful actions, Plaintiffs and the other members

21   of the Class will be irreparably harmed in that they will not receive their fair portion of the

22   value of Harrah's assets and business and will be prevented from obtaining the real value of

23   their equity ownership of the Company.  Unless the Proposed Transaction is enjoined by the

24   Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiffs

25   and the members of the Class; will not engage in arm's-length negotiations on the Proposed

26   Transaction terms; and may consummate the Proposed Transaction, all to the irreparable harm

27   of the members of the Class.

28

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

109.    Plaintiffs and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiffs and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

### THIRD CAUSE OF ACTION

**On Behalf of Plaintiffs and the Class Against
the Private Equity Defendants for Aiding and Abetting the
Individual Defendants' Breach of Fiduciary Duty**

110.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

111.    The Private Equity Defendants have acted and are acting with knowledge or with reckless disregard that the Individual Defendants are in breach of their fiduciary duties to Harrah's public shareholders and have participated in such breaches of fiduciary duties by the directors of Harrah's.

112.    The Private Equity Defendants have aided and abetted the Individual Defendants' wrongdoing alleged herein.  The Private Equity Defendants are also active and necessary participants in the Individual Defendants plan to complete the Proposed Transaction on terms that are unfair to Harrah's shareholders, as the Private Equity Defendants seek to pay as little as possible to Harrah's shareholders.

113.    Plaintiffs have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.      Declaring this action to be a proper class action and certifying Plaintiffs as class representatives and Plaintiffs' counsel as class counsel;

B.      Preliminarily and permanently enjoining defendants from disenfranchising the Class and effectuating the Proposed Transaction;

C.      Declaring that the Individual Defendants have violated SEC Rule 14(a)-9;

D.      Declaring that the Individual Defendants have breached their fiduciary duty to Plaintiffs and the Class;

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

1       E.    Declaring that the Private Equity Defendants have aided and abetted the

2   Individual Defendants' breach of fiduciary duty;

3       F.    Declaring the Proposed Transaction void and ordering rescission if

4   consummated;

5       G.    Requiring defendants to account for all shares, money and other value

6   improperly received from Harrah's;

7       H.    Requiring disgorgement and imposing a constructive trust on all property and

8   profits defendants received as a result of their wrongful conduct;

9       I.    Awarding damages, including rescissory damages, in favor of Plaintiffs and the

10  Class against all defendants, jointly and severally, together with interest thereon;

11      J.    Awarding fees, expenses and costs to Plaintiffs and Plaintiffs' counsel; and

12      K.    Granting such other and further relief as the Court deems just and proper.

16  **JURY DEMAND**

17      Plaintiffs demand a trial by jury.

18  Dated: February 2, 2007            ALBRIGHT, STODDARD, WARNICK &
                                  ALBRIGHT

                                  By:_____
                                  G. Mark Albright
                                  Quail Park I, Suite D-4
                                  801 South Rancho Drive
                                  Las Vegas, NV 89106
                                  Tel: 702-384-7111
                                  Fax: 702-384-0605

                                  Plaintiffs' Local Liaison Counsel

Of Counsel:

FARUQI & FARUQI, LLP
Nadeem Faruqi
Shane T. Rowley
Antonio Vozzolo
320 East 39th Street
New York, New York 10016

*(left margin, vertical text)* ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

- 26 -

1  Tel: 212-983-9330
   Fax: 212-983-9331
2
   Chair of Plaintiffs' Executive Committee and
3  Counsel for Plaintiff Natalie Gordon

4  Mark C. Gardy
   James S. Notis
5  Gardy & Notis, LLP
   440 Sylvan Avenue, Suite 110
6  Englewood Cliffs, New Jersey 07632
   Tel: 201-567-7377
7  Fax: 201-567-7337

8  Robert I. Harwood
   Wechsler Harwood, LLP
9  488 Madison Avenue
   New York, New York 10022
10 Tel: 212-935-7400
   Fax: 212-753-3630
11
   Lee Squitieri
12 Stephen J. Fearon, Jr.
   Squitieri & Fearon, LLP
13 32 East 57th Street, 12th Floor
   New York, New York 10022
14 Tel: 212-421-6492
   Fax: 212-421-6553
15
   Plaintiffs' Executive Committee and Counsel for
16 Plaintiffs' Max Phillips, Lou Ann Murphy, and
   Leonard Shapiro
17

18

19

20

21

22

23

24

25

26

27

28

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106

- 27 -

**CERTIFICATE OF SERVICE**

I hereby certify that on this ___5___ day of February, 2007, a true and correct copy of the foregoing **FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** was served on all interested parties via facsimile and E-Service:

Michael N. Feder
Beckley Singleton, Chtd.
530 Las Vegas Blvd, South
Las Vegas, Nevada 89101
Fax: (702) 385-9447

Curtis V. Trinko
Law Offices of Curtis V. Trinko, LLP
16 West 46th Street, 7th Floor
New York, New York 10036
Fax: (212) 986-0158

Jack G. Fruchter
Abraham Fruchter & Twersky, LLP
One Pennsylvania Plaza, #2805
New York, New York  10119
Fax: (212) 279-3655

Douglas R. Britton
Brian O'Mara
Lerach Coughlin Stoia Geller
655 West Broadway, #1900
Fax: (619) 231-7423

Antonio Vozzolo
Nadeem Faruqi
Shane T. Rowley
FARUQI & FARUQI, LLP
320 East 39th Street
New York, New York 10016
Fax: 212-983-9331

Thomas J. McKenna
Gainey & McKenna
295 Madison Avenue
4th Floor
New York, New York 10017
Fax: (212) 983-0383

Robert I. Harwood
Wechsler Harwood, LLP
488 Madison Avenue
New York, New York 10022
Fax: (212) 753-3630

Lee Squitieri
Squitieri & Fearon, LLP
32 East 57th Street, 12th Floor
New York, New York  10022
Fax: (212) 421-6553

Mark C. Gardy
James S. Notis
Gardy & Notis, LLP
440 Sylvan Avenue, #110
Englewood Cliffs, New Jersey 07632
Fax:  (201) 567-7337

An Employee of Albright Stoddard Warnick & Albright

ALBRIGHT, STODDARD, WARNICK & ALBRIGHT
A PROFESSIONAL CORPORATION
QUAIL PARK, SUITE D-4
801 S. RANCHO DRIVE
LAS VEGAS, NEVADA 89106